Neidinger v. County of Pierce

Declaration of Christopher Taylor in Support of
Plaintiff's Response to Defendants' Motion for
Summary Judgment

# Exhibit A

Plaintiff's First Discovery Request to Defendant
County of Pierce and Responses Thereto

1

Honorable Ronald B. Leighton
U.S. District Judge

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8

9

NEIDINGER, KRISTINE M.,

NO.  C10-5702 RBL

10

Plaintiff,

11

vs.

PLAINTIFF'S FIRST DISCOVERY
REQUEST TO DEFENDANT COUNTY
OF PIERCE

12

13

COUNTY OF PIERCE, et al.,

AND RESPONSES THERETO

14

Defendants.

15

COMES NOW Defendant Pierce County, by and through its attorneys, Prosecuting

16

Attorney Mark Lindquist and deputy prosecuting attorney Michelle Luna-Green, and answers

17

Plaintiffs First Discovery Request:

18

19

**PRELIMINARY STATEMENT**

20

It should be noted that this responding party has not fully completed their investigation

21

of facts related to this case, has not fully completed their discovery in this action, and has not

22

completed their preparation for trial.  All of the answers contained herein are based only upon

such information and documents that are presently available to and specifically known to this

23

responding party and disclose only those contentions which presently occur to such

24

responding party.

25

It is anticipated that further discovery, independent investigation, legal research and

analysis will supply additional facts, add meaning to the known facts, as well as establish

**ORIGINAL**

1

entirely new factual conclusions, all of which may lead to substantial additions to, changes in, and variations from the contentions herein set forth.

Therefore, the following interrogatory and production responses are given without prejudice to the responding party's right to produce evidence of any subsequently discovered fact or facts which this responding party may later recall. The responding party accordingly reserves the right to change any and all answers herein when additional facts are ascertained, analyses are made, legal research is completed, and contentions are made. The answers contained herein are made in a good faith effort to supply as much factual information and as much specification of legal contentions as is presently known but should in no way be to the prejudice of this responding party in relation to further discovery, research, or analysis.

## ANSWERS TO INTERROGATORIES and REQUESTS FOR PRODUCTION

**INTERROGATORY NO. 1:**
What is the full name, title, relationship to Defendant County of Pierce, marital status, and full name of spouse, if applicable, of each person mentioned in any document identified in Section B of Defendants' Initial Disclosures, including, but not limited to, each person mentioned in Pierce County Detention and Correction Center Incident Reports, Numbers 2497335 and 2497330.

**ANSWER:** Objection. Overly broad. Further objection, request calls for private and confidential personnel file information pursuant to RCW 42.56.230. Further objection, Pierce County has a duty to defend and indemnify any employee named who was acting within their official duties pursuant to Pierce County Code 2.120.010.

Without waiving any objections, Pierce County provides the following answer:

1.  Ltnt. Sandra Gerrish, Pierce County Correctional Lieutenant.
2.  Sgt. Richard D. Malidore, Pierce County Correctional Sergeant.
3.  Tamara Kay Pihl, Pierce County Corrections Deputy.
4.  Elizabeth Wyatt Earp, Pierce County Corrections Deputy.
5.  Josef Michael Crews, Pierce County Corrections Deputy.
6.  Julie McArthur, Pierce County Corrections Deputy.
7.  Ann Michelle Van Zuyt,  Pierce County Corrections Deputy.
8.  Joyce Newlun, Pierce County Correctional Nurse.
9.  James Patrick Williams, Pierce County Corrections Deputy.

MICHELLE LUNA-GREEN

1

2   **REQUEST FOR PRODUCTION NO. 1:**

3   Produce all documents or electronically stored information in Defendant County of Pierce's possession, custody, or control-not including those already produced pursuant to Defendants'

4   Initial Disclosure – that contains information about the actions of Plaintiff Neidinger in April of 2008. [Please note that "documents or electronically stored information" as the term is used

5   in this and all other discovery requests, includes writings, drawings, graphs, charts, photographs, sound recordings, images, video recordings, and other data or data

6   compilations.]

7   **ANSWER:**

8   See attached CD containing detailed information Re Taser Data as requested:

9   CD bates number:  DEF-NEIDINGER 1.  To the best of our knowledge, this CD contains readings of the tasers available for use during that time in booking.  However, at this time

10  Pierce County cannot confirm that this is a record of <u>all</u> tasers available for use in booking during that time.  Nor can Pierce County isolate at this time which taser was used on plaintiff.

11  Defendants will supplement taser information once defendants receive the download for M26

12  Taser Serial #P2-013648.  This particular taser failed to interface with Deputy Carn's computer when he attempted download.  The only other way to retrieve the data stored off the

13  memory module inside of the taser is to send it back to Taser Intl. for them to do a "Certified Data Download."  This is a destructive procedure where they have to destroy the taser to

14  remove the memory module that contains all of the firing and time change data.  Once this module is removed, they can read the information and certify it.  This same lab is responsible

15  for doing similar testing for court cases, death investigations, and internal affair investigations.

16
    **Files currently held on the CD**

17  M26 P4-002507

    M26 P4-003906

18  M26 P4-015281

    M26 P4-015663

19  M-26 P2-013648

    Time Data

20  X26 X00-329782

21
    See attached booking file which contains the original booking from the arresting officers,

22  property inventory, receipts and staffing schedule.

    (DEF-NEIDINGER 50 – DEF-NEIDING 69)

23

24  _____

    MICHELLE LUNA-GREEN

25

3

**REQUEST FOR PRODUCTION NO. 2:**

Produce all documents or electronically stored information in Defendant County of Pierce's possession, custody, or control – not including those already produced pursuant to Defendants' Initial Disclosures – that contain information about medical treatment of Plaintiff Neidinger in April of 2008.

**ANSWER:**

See attached medical records regarding treatment of Plaintiff Neidinger on April of 2008:

1.     Pierce County Detention and Corrections Center
   Health Services Division
   CHRONOLOGICAL RECORD OF MEDICAL CARE
   (DEF-NEIDINGER 2 – DEF-NEIDINGER 3)

2.     Pierce County Detention and Corrections Center
   Health Services Division
   Intake Medical Records
   (DEF-NEIDINGER 4)

3.     Pierce County Detention and Corrections Center
   Health Services Division
   Verification of Medications
   (DEF-NEIDINGER 5)

**REQUEST FOR PRODUCTION NO. 3:**

Produce all documents or electronically stored information in Defendant County of Pierce's possession, custody, or control – not including those already produced pursuant to Defendants' Initial Disclosures – that contain information about the mental health treatment of Plaintiff Neidinger in April of 2008.

**ANSWER:**

Objection. No mental health records on file for Plaintiff Neidinger.

MICHELLE LUNA-GREEN

4

**REQUEST FOR PRODUCTION NO. 4:**

Produce all documents or electronically stored information in Defendant County of Pierce's possession, custody, or control that contain information about Defendant County of Pierce's policies, practices or customs that existed on April 9, 2008 with respect to booking pretrial detainees in general, and pretrial detainees with body piercings in particular.

**ANSWER:**  See attached – Note nothing specific related to body piercing bookings.

Booking Procedures Chapter 2.01
Searches Chapter 2.02
Property and Money Chapter 2.03
(DEF-NEIDINGER 6 – DEF-NEIDINGER 19)

**REQUEST FOR PRODUCTION NO. 5:**

Produce all documents or electronically stored information in Defendant County of Pierce's possession, custody, or control that contain information about Defendant County of Pierce's policies, practices or customs that existed on April 9, 2008 with respect to the use of force on pretrial detainees in general, and the use of tasers on pretrial detainees in particular.

**ANSWER:**

See relevant documents attached.

USE OF FORCE Chapter 3.05
(DEF-NEIDINGER 20 – DEF-NEIDINGER 27)

Force and Restraints Chapter 6.11
(DEF-NEIDINGER 28 – DEF-NEIDINGER 29)

**REQUEST FOR PRODUCTION NO. 6:**

Produce all documents or electronically stored information in Defendant County of Pierce's possession, custody, or control that contain information about Defendant County of Pierce's policies, practices or customs that existed on April 9, 2008 with respect to the use of restraints – e.g. handcuffs, leg irons – on pretrial detainees.

**ANSWER:**

See response to RFP No. 5

MICHELLE LUNA-GREEN

5

**REQUEST FOR PRODUCTION NO. 7:**

Produce all documents or electronically stored information in Defendant County of Pierce's possession, custody, or control that contain information about Defendant County of Pierce's policies, practices or customs that existed on April 9, 2008 with respect to the provision of medication to pretrial detainees.

**ANSWER:**

See relevant documents attached.

INMATE HEALTH CARE SERVICES Chapter 11
(DEF-NEIDINGER 30 – DEF-NEIDINGER 49)


MICHELLE LUNA-GREEN

6

## CERTIFICATE OF COMPLIANCE

The undersigned attorney for Defendant has read the foregoing Responses To

Plaintiffs' First Discovery Request to Pierce County and certifies that said Answers,

Responses, and Objections (if any) are in compliance with FRCP 26(g).

DATED this 23rd day of February, 2011.

MICHELLE LUNA-GREEN
State Bar Number 27088
Pierce County Prosecutor / Civil
955 Tacoma Avenue South, Suite 301
Tacoma, WA 98402-2160
Ph: 253-798-6380 / Fax: 253-798-6713

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Defendant Pierce County's
Responses to Plaintiff's First Interrogatories and Requests for Production was delivered this
_____ day of February, 2011, to ABC-Legal Messengers, Inc., with appropriate instruction to
forward the same to counsel for Plaintiffs as follows:

Christopher Taylor
The Evergreen Law Group, P.S.
203 4th Avenue East Suite 204
Olympia, WA 98501

GINA M. LANE
Paralegal
Pierce County Prosecutor's Office
Civil Division, Suite 301
955 Tacoma Avenue South
Tacoma, WA 98402-2160
Ph: 253-798-7787 / Fax: 253-798-6713

7

## VERIFICATION

Pierce County Bureau Chief, Martha Karr declares that she has read the above foregoing Responses to Interrogatory No. 1 and Request for Production No. 1; Request for Production No. 4 thru 7 to Piece County in the case of Neidinger v. Pierce County, et al., Cause No. C10-5702 RBL, knows the contents thereof, and believes the same to be true.

Signed on February 23rd, 2011, at Tacoma, Washington.

Pierce County Bureau Chief, Martha Karr

**ORIGINAL**

# VERIFICATION

Pierce County Deputy, Donald Carn declares that he has read the above foregoing

Responses to Request for Production No. 1 to Piece County in the case of Neidinger v.

Pierce County, et al., Cause No. C10-5702 RBL, knows the contents thereof, and believes

the same to be true.

Signed on February 22nd, 2011, at Tacoma, Washington.

Pierce County Deputy, Donald Carn

**ORIGINAL**

# VERIFICATION

Pierce County Clinical Administrative Assistant Lana Dao, declares that she has read the above foregoing Responses to Request for Production No. 2 to Piece County in the case of Neidinger v. Pierce County, et al., Cause No. C10-5702 RBL, knows the contents thereof, and believes the same to be true.

Signed on February 22nd, 2011, at Tacoma, Washington.

P.C. Clinical Administrative Asst. Lana Dao

**ORIGINAL**

# VERIFICATION

Pierce County Clinical Coordinator Judy Snow, declares that she has read the above foregoing Responses to Request for Production No. 3 to Piece County in the case of Neidinger v. Pierce County, et al., Cause No. C10-5702 RBL, knows the contents thereof, and believes the same to be true.

Signed on February 22nd, 2011, at Tacoma, Washington.

_____
P.C. Clinical Coordinator Judy Snow

**ORIGINAL**

**Pierce County Detention and Corrections Center**
*Health Services Division*
910 Tacoma Avenue South - Tacoma, Washington 98402
(253) 798-4013- Fax (253) 798-6635

# CHRONOLOGICAL RECORD OF MEDICAL CARE

Name: NEIDINGER, KRISTINE MARIA          Chart ID:49816    Age: 46      SSN: 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
AKAs:
DOB: 02/26/1964    Race: WHITE          Ethnicity: NON-HISPANIC          Gender: FEMALE
**Allergies: NO KNOWN DRUG ALLERGIES**

| Date / Time | | S - Subjective | O- Objective | A - Assessment | P - Plan |
|---|---|---|---|---|---|
| | BP: | Temp: | PR: | RR: | Wt.: | SAO2: | Vision: |

| | |
|---|---|
| 04/09/08 19:06 A | 1) Cuffs removed from bilateral wrists.  No tissue trauma noted.  Cuff to R ankle still on. |
| 04/09/08 19:07 P | 1) Assess tissue integrity to R ankle when cuff is removed.                     **LYNN TOLLEFSON-CHUNG** |

| | BP: | Temp: | PR: | RR: | Wt.: | SAO2: | Vision: |
|---|---|---|---|---|---|---|---|

| | |
|---|---|
| 04/09/08 21:06 A | 1) Cuffs rem'd from bilat ankles.  Tissue integrity intact. |
| 04/09/08 21:07 P | 1) No further monitoring.                     **LYNN TOLLEFSON-CHUNG** |

| 04/10/08 14:26 | BP: 116/85   Temp: 97.2   PR: 116   RR: 14   Wt.: 164   SAO2: 99   Vision:      **NANCY AMOS** |
|---|---|

denies opiate w/d.  states "bleeding ulcer".  doesn't know the name of meds.

| | |
|---|---|
| 04/10/08 14:49 S | C/O NV all night with the last time this am.  NO Blood or what appeared to be blood products.  States has not eaten today but is drinking water.  States hx of Gastric ulcer diagnoses by endoscopy lat month.  Takes prilosec daily.<br>Take antidepressant meds.  Very anxious and upset now.<br>3.  States was tazed on chest and back least pm.  NO CV Hx.<br>No Drug Use. |
| 04/10/08 14:51 O | Very upset crying intermittently due to circumstances but able to stop, AO commo well<br>Lungs CAT GBS<br>CV RRR<br>Chest with two small scabbed burns without infection, Let upper back with 4 small circular scabbed burns without infection.<br>Abd: soft, BS+, mild general tenderness without significant epigastric tenderness, no peritoneal signs<br>Declines DRE. ( explained only to determine Bleeding, still refused) |
| 04/10/08 14:54 A | 1) Hx  Gastric Ulcer HX<br>2) Resolved NV<br>3) Depression hx |
| 04/10/08 14:55 P | 1) prilosec tonight                     **KENNETH FLECK, PAC**<br>2) antacids<br>3) hydration<br>4) Call clinic if increased ABD pain or NV<br>5) FU tomorrow for re-eval.<br><br>Medications Prescribed:<br>1) PRILOSEC OTC (omeprazole) 20mg 1.00 Tablet Oral See Directions 1 days supply<br>- Open |

# Pierce County Detention and Corrections Center
## Health Services Division
910 Tacoma Avenue South - Tacoma, Washington 98402
(253) 798-4013- Fax (253) 798-6635

# CHRONOLOGICAL RECORD OF MEDICAL CARE

Name: NEIDINGER, KRISTINE MARIA      Chart ID:49816    Age: 46     SSN: 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

AKAs:

DOB: 02/26/1964    Race: WHITE      Ethnicity: NON-HISPANIC      Gender: FEMALE

**Allergies: NO KNOWN DRUG ALLERGIES**

| Date / Time | | S - Subjective | O- Objective | | A - Assessment | | P - Plan | |
|---|---|---|---|---|---|---|---|---|
| | BP: | Temp: | PR: | RR: | Wt.: | SAO2: | Vision: | |

| | |
|---|---|
| 04/10/08 12:03 A | 1) Medications for ulcers verified through Walgreen's @ 203-0074; |

| | | |
|---|---|---|
| 04/10/08 12:11 P | 1) Consulted with MOD PA C. Ortiz;<br>2) medication orders recd per above;<br>3) f/u with above provider on 4/16/2008;<br><br>Medications Prescribed:<br>1) PRILOSEC (OMEPRAZOLE) 20MG 1.00 Capsule, Delayed Rel Pellets Oral QD 30 days supply - Open | JOYCE NEWLUN |

| | BP: | Temp: | PR: | RR: | Wt.: | SAO2: | Vision: |
|---|---|---|---|---|---|---|---|

| | | |
|---|---|---|
| 04/10/08 13:16 A | 1) Med start for ulcers and depression- Prilosec was to be a therapeutic interchange for nizatidine not clomipranmine; | |

| | | |
|---|---|---|
| 04/10/08 13:18 P | 1) medication orders recd for earlier order however, this one is to correct therapeutic interchange and complete earlier order;<br><br>Medications Prescribed:<br>1) PRILOSEC (OMEPRAZOLE) 20MG 1.00 Capsule, Delayed Rel Pellets Oral QD 30 days supply - Discontinued<br>2) PRILOSEC OTC (omeprazole) 20mg 1.00 Tablet Oral QD 30 days supply - Open<br>3) ANAFRANIL (CLOMIPRAMINE HYDROCHLORIDE) 25MG 2.00 Capsule Oral QD 30 days supply - Open | JOYCE NEWLUN |

DEF-NEIDINGER 3

## Chapter 3.05

## USE OF FORCE

### 3.05.010   USE OF FORCE

Officers are daily confronted with situations where control must be exercised to effect an arrest, suppress an affray, restore the peace, and protect the public safety. Such control may be achieved through verbal negotiation or the use of force. Officers may use that amount of force that is necessary to effect the lawful purpose intended, provided that no reasonably effective alternative to the use of that force appeared to exist at that time. (RCW 9A.16.010)

Frequently, officers are placed into situations that have deteriorated beyond verbal communication. In these cases, the officer must immediately employ the necessary force to overcome the resistance and/or protect his safety or the safety of others. Force may be applied through the use of a person's body, weapons, equipment, and/or other instruments.

Professional law enforcement officers should employ learned skills in verbal negotiation as their first choice in restoring the peace and overcoming verbal resistance. The alternative of using force comes at the point verbal communications are no longer effective.

The gauge for the necessary force to use is the amount of resistance that must be overcome. Officers are not expected to be injured before resorting to force; they may employ force to keep themselves and others from being injured.

Officers are expected to maintain their proficiency in verbal skills, defensive skills, and the use of authorized tools, i.e., chemical agents, Tasers, batons, handcuffs, and firearms, by applying themselves to Department-provided training and self-initiative.

Proficiency includes keeping physically and mentally prepared. The officer must be aware of the legal and moral limitations governing the use of force; however, legal responsibility may become a question for the courts or Department review. *(Revision referencing Taser Use, General Order 05-001, dated 4/05, adding Taser to list of tools)*

### 3.05.011   FORCE OPTIONS AND FORCE CONTINUUM

Force options available to commissioned officers are: Officer Presence; Verbal Interaction; Soft Empty Hands; OC (pepper) Spray and Taser; Hard Empty Hands; Impact Weapons; Deadly Force.

The phrase "Force Continuum" implies a process that allows an officer to move freely between force options as the situation dictates. Department training and policy embodies this

concept. *(Revision adding Taser to Use of Force Continuum, 8/2005)*

### 3.05.020   USE OF DEADLY FORCE

Officers may use deadly force to protect themselves or others from what they reasonably believe to be an imminent threat of death or serious bodily injury; or to effect the capture or prevent the escape of a suspect whose freedom is reasonably believed to represent a significant threat of death or serious bodily injury to the officer or others.

The use of deadly force must be based only on the facts known to the officer, or reasonable assumptions made by the officer at the moment deadly force is used. Facts unknown to the officer, no matter how compelling, cannot be considered in later determining if the use of deadly force was justified. All use of deadly force shall be reviewed by the Board of Professional Standards.

For the purpose of this policy, "deadly force" is defined as that force which is likely to cause death or serious bodily injury. Also for the purpose of this policy, "lethal" is interchangeable with "deadly".

### 3.05.030   USE OF DEADLY FORCE--FLEEING FELONS

By statute, an officer is authorized to use deadly force when necessary in retaking an escaped prisoner who has been committed, arrested for, or convicted of a felony; or in arresting a person who has committed a felony and is fleeing from justice (RCW 9A.16.040). Such force may only be exercised when all reasonable alternatives have been exhausted, and must be based only on facts or what appear to be the facts known to the officer at the moment he exercises the use of deadly force.

<u>Note</u>: The United States Supreme Court has recently held that deadly force may not be used to prevent the escape of an <u>apparently unarmed</u> suspected felon unless it is necessary to prevent the escape of such felon <u>and</u> the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others. <u>Tennessee v. Garner</u> (3/27/85).

No Department member shall ever intentionally jeopardize the life or physical safety of innocent citizens in any manner while acting to carry out their official duties.

### 3.05.040   USE OF DEADLY FORCE--FLEEING MISDEMEANANTS

Officers shall not intentionally use deadly force to effect the arrest or prevent the escape of a misdemeanant.

### 3.05.050   WARNING SHOTS

Generally, warning shots will not be fired in an attempt to induce the surrender of a suspect, and are only permissible under circumstances where the officer could have used deadly force.

### 3.05.055   DISPATCHING INJURED OR DANGEROUS ANIMALS

Force may be used to kill a dangerous animal or one so seriously injured that compassion requires its relief from further suffering, provided:

1.   The duty supervisor is notified prior to the actual dispatching of the animal.

2.   The officer follows the department-approved guidelines provided by the Training Division.

The use of a firearm to dispatch an animal will be reported in accordance with Section 3.05.120 of this manual. Any other use of force to dispatch an animal will be reported in accordance with section 3.05.060.

### 3.05.060   REPORTING

Whenever an officer must employ physical force other than discharging a firearm at another human being in the course of effecting an arrest or controlling a dangerous situation, the officer will promptly submit a written report on the incident.

### 3.05.065   DEFENSIVE USE OF CHEMICAL AGENTS/PEPPER SPRAY

Frequently officers encounter situations involving physical resistance to arrest, or situations in which they are the targets of physical attack while discharging their routine duties. These situations rarely justify the use of firearms, and the use of the baton is sometimes necessary to safely subdue a suspect. However, the use of the baton has in some instances resulted in injury to the suspect or other officers involved in the struggle. Although batons or firearms may still be required in appropriate circumstances, proper use of defensive chemical agents or pepper spray will enable officers to effectively subdue many violently resisting suspects.

Chemical agents are not designed to replace other weapons but are designed to provide an additional tool for controlling "out-of-control" suspects.

When the chemical is used, the officer using it will submit a report covering the incident. Such report shall include a brief statement regarding the effectiveness of the chemical.

The booking desk will be notified whenever an arrestee has been subjected to a chemical

Case 3:10-cv-05702-RBL Document 37-1 Filed 06/12/12 Page 18 of 23

agent for subsequent monitoring.

### 3.05.066   TASER USE GUIDELINES

Officers shall adhere to the following guidelines when utilizing department-approved Tasers.

A.    <u>Use of Force Continuum</u>: Within the Use of Force continuum, the Taser ranks comparably to O/C Spray products. That is, after soft, empty hand techniques (counter-joint) and before hard, empty hand techniques (strikes w/body, weapons).

B.    <u>Qualified Personnel</u>: Officers must successfully complete the department-approved Taser training course prior to being authorized to use the Taser in the field.

C.    <u>Equipment</u>: Only department-authorized Tasers and holsters will be permitted. The Taser/holster will be carried on the opposite side from the employee's firearm.

D.    <u>Deployment</u>: The term "deploy" refers to any of the four following methods: Display, Arc Display, Dart Contact, or Direct Contact.

     a.   Whenever possible, officers shall advise the suspect and other responding officers of their intent to deploy the Taser.

     b.   If possible, responding officers shall attempt to secure the suspect while the officer maintains the Taser in a ready position.

     c.   After each deployment of the Taser, officers shall evaluate the need for further deployment.

     d.   Generally, the Taser shall not be used against pregnant women, the elderly, or small children.

     e.   Prior supervisory approval is not necessary for qualified personnel to deploy the Taser.

E.    <u>Post-Deployment/Medical</u>

     a.   Removal of the Taser probes from the suspect is the officer's responsibility. If the probes are removed in the field, officers can use their discretion regarding the need for medical aid to respond. Have the suspect transported to a medical facility in the event the probes are in a sensitive area (eyes, mouth, and groin), so the probes can be removed by a physician.

     b.   If an arrestee has been subjected to Taser dart penetration and has not been seen by medical personnel, the officer will notify the Jail booking desk staff.

     c.   Officers shall photograph or cause to be photographed any visible

Taser injuries to the suspect.

d.  Expended Taser darts which have penetrated the skin shall be treated as biohazards and processed according to department guidelines.

F.  Reporting: Any method of deployment of the Taser (See paragraph D) shall be documented by the officer on both a general report and a department Use of Force form. The method used and number of deployments shall be clearly documented. The reporting officer is responsible for forwarding the Use of Force form to the Training Division Captain.

G.  Maintenance: Officers shall inspect their Tasers for damage on a regular basis. A daily test fire/spark test is recommended. Spark tests must be performed at the start of shift and be documented in the officer's notebook.

   a.  Exposure to Moisture: Tasers that have been exposed to significant moisture may not work or may discharge unintentionally even in the "off" or "down" position. Remove the Air Cartridge immediately and dry the Taser at least 24 hours before proceeding with the manufacturer's instructions on disassembly and inspection.

   b.  Excessive hard drops or other extreme circumstances: Although they are built to withstand the rigorous environment of law enforcement, Tasers are not designed to withstand extreme circumstances. Remove cracked, broken, or damaged Tasers from service immediately.

   DO NOT USE A WEAPON THAT SHOWS OBVIOUS SIGNS OF DAMAGE. *(Revision dated 7/05 per General Order 05-001)*

## 3.05.067   OFF-DUTY USE OF NON-LETHAL WEAPONS

When carried with the potential for use under color-of-law, non-lethal weapons carried off-duty must be those issued or authorized by the department and those who carry them must have had prior training in their use.

## 3.05.070   IMPACT WEAPONS

The department-approved batons and flashlights are impact weapons and are intended to be used as defensive weapons. Impact weapons will be used with discretion and common sense, and then only in the manner prescribed by current Department training techniques. Each officer must complete approved training as directed by the Department prior to carrying the baton. Corrections officers and other personnel will fall under this guideline IAW bureau policy. (from Section 3.03.310)

Case 3:10-cv-05702-RBL  Document 37-1  Filed 06/12/12  Page 20 of 23

### 3.05.080   HANDCUFFS

Handcuffs are effective tools which will be used on all arrestees prior to transport. Only those handcuffs authorized or issued by the Department will be used.

The method of use will be consistent with Department guidelines and current training techniques. The only exception to mandatory handcuffing is when it is physically impossible to handcuff because of medical or physical impairment.

### 3.05.090   NECK RESTRAINT HOLDS

The Department recognizes that the use of neck restraint holds is an effective method to restrain and control subjects. Some types of neck restraint holds are considered a use of deadly force while others through application and level of application are available for use at lower levels of the continuum of force. "Bar arm" type chokes that compress the airway and other structures of the front part of the neck shall be considered a use of deadly force. The Lateral Vascular Neck Restraint (LVNR) technique which applies pressure to the lateral portion of the neck and restricts blood flow to and from the brain shall not be considered a use of deadly force.

Absent justification for the use of deadly force, the Lateral Vascular Neck Restraint is the only department-authorized neck restraint technique. LVNR is categorized into three levels of application:

1.  LVNR Level I – Minimum Compression/Minimum Restraint does not produce unconsciousness and is in the Unarmed Defensive Tactics (UDT) Level I or soft empty hands category in the department continuum of force.

2.  LVNR Level II – Moderate Compression/Moderate Restraint, does not produce unconsciousness and is also in the UDT Level I or soft empty hands category in the department continuum of force.

3.  LVNR Level III – Maximum Compression/Maximum Restraint may produce unconsciousness and is in the UDT Level II or hard empty hands category in the department continuum of force.

Only personnel who have been certified in the use of Lateral Vascular Neck Restraint may use the technique in less than deadly force circumstances.

Prior to booking in the jail, all persons who have been rendered unconscious with LVNR shall be screened by a medical professional from a fire crew, ambulance, or emergency room. The application of LVNR shall be annotated on the booking form.

If the subject is rendered unconscious as a result of an LVNR application, he or she must be visually observed continuously for two (2) hours to insure no complications result following

LVNR use. This observation period may include observation of the subject in the jail prior to placement into population.

As with all use of force incidents, the use of LVNR shall be documented in the general report citing the specific circumstances of use, level of aggression by the subject, level of LVNR applied, how quickly compliance was achieved, how compliance was indicated, whether or not the person was rendered unconscious, and any injuries to the officer or to the subject. If the subject was rendered unconscious, the general report shall include documentation of the screening by the medical professional who examined the subject prior to booking including identification of the medical professional. The general report shall also include detailed documentation of the two-hour observation period including the identities of the observers and a record of their time. A copy of this report shall be sent to the training unit. (Updated 10/24/03, per General Order 03-006, replacing CHOKE HOLDS)

## 3.05.100   MOTOR VEHICLE AS A USE OF FORCE

The use of a Department vehicle intentionally to disable an occupied suspect's car or otherwise used as an instrument against any other type of conveyance or against a pedestrian is to be considered a use of force. A police vehicle may be used to disable, block, or as force against another vehicle or person only after all other reasonable alternatives have been exhausted, and the officer possesses reasonable grounds to believe that the fleeing vehicle and/or occupant, or person, constitutes an immediate threat to public safety. Such consideration shall include due concern for passengers in a vehicle against whom such force is being used. Such use of force shall be reviewed by the Board of Professional Standards in all cases. The use of the Pursuit Interdiction Technique (PIT) has been authorized by PCSD General Order 00-003. PIT will be utilized in a manner consistent with Department guidelines and current training techniques.

## 3.05.101   VEHICLE USE OF FORCE CONTINUUM

- Audible and/or visual signals
- Stop Sticks/ Tire deflation devices
- Pursuit Interdiction Technique
- Ramming

## 3.05.110   WEAPONS DISPLAY

Weapons shall not be displayed unnecessarily or drawn in public places, except for official use.

Case 3:10-cv-05702-RBL   Document 37-1   Filed 06/12/12   Page 22 of 23

### 3.05.120   REPORT OF DISCHARGE OF FIREARM

Whenever officers discharge a department-issued firearm, either accidentally or in the performance of their duties, except at an approved range, they shall notify their supervisor as soon as possible. Officers must report any deliberate or accidental discharging of firearms in a written report. In the case of a discharge of a firearm at another human being, a statement will be taken from the involved officer(s) rather than having him/them prepare a written report.

Supervisors shall make immediate notification to the proper personnel in the case of an unscheduled firearm discharge.

### 3.05.130   REVIEW OF UNSCHEDULED FIREARMS DISCHARGE

All unscheduled firearms discharges except those on the range shall be reviewed by the Board of Professional Standards. Firearms incidents on the range may be referred to the Board of Professional Standards.

## PCDCC BOOKING AND SPECIAL IDENTIFICATION PROCESSING FORM
### (Must Be Completed Prior to Booking or S.I.P.)

LAKEWOOD P.D. _____  EDGEWOOD P.D. _____  UNIVERSITY PLACE P.D. _____

DATE: 4-9-08

TIME: 1535

DATE OF BIRTH: ████████

SUBJECT NAME: Neidinger      Kristine      M
                  Last           First        Middle

ALIASES: _____

ADDRESS: 1152 aberdeen, ave. NE, Renton, Wa 98056

IS THIS PERSON ELIGIBLE FOR S.I.P. [ ] YES [ ] NO   BA:? [ ] YES [ ] NO   Reading [_____]

A. Vehicular Accident Prior to Arrest?   [ ] Yes [X] No
B. Injuries Sustained Incidental to Arrest?   [ ] Yes [X] No
C. Medical Aid Offered?   [ ] Yes [X] No
D. Medical Aid Accepted?   [ ] Yes [X] No
E. Medical Aid Declined or Refused?   [ ] Yes [X] No
F. Mental Problems?   [ ] Yes [X] No
G. Suicide History or Tendencies?   [ ] Yes [X] No
H. Any Signs of Depression?   [ ] Yes [X] No

I. Meth Arrest?   [ ] Yes [X] No
J. Meth Lab Arrest?   [ ] Yes [X] No
K. Meth Exposure?   [ ] Yes [X] No
L. Was Subject Contaminated?   [ ] Yes [X] No
M. If No, Was Subject Evaluated For   [ ] Yes [X] No
   Decontamination?
N. Meth Evaluation Done by? _____

Any special conditions or circumstances indicating this individual poses a threat to any identifiable person or class of persons?

[ ] Yes [X] No  If yes, please describe in detail all such circumstances or conditions, and list any related case numbers:

_____
_____

Other Remarks: _____

Assaultive [ ] Yes [X] No   Uncooperative [ ] Yes [X] No        Evidence Placed in Property Room [ ] Yes [X] No

If yes, please list or describe: _____

**\*NOTE: IF TREATED AT A HOSPITAL, MEDICAL INSTRUCTION/RELEASE FORM MUST BE PROVIDED BY THE ARRESTING/TRANSPORTING OFFICER AND ATTACHED TO THIS FORM.**

PLACE OF ARREST: N 37th & J St.

Vehicle Impound [ ] Yes [X] No  If yes, Name of Towing Company _____

\*Incident Number  080 100 783

TPD/PCSO ARRESTS ONLY

Citation Number _____

| CHARGE | CNTS | CHARGE CODE | COURT | WRNT/CAUSE NO. | BAIL | DV? |
|--------|------|-------------|-------|----------------|------|-----|
| Mal. Misch | 1 | 8.12.010.5 | TMC | | | Yes |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

ARRESTING/TRANSPORT OFFICER: _Jeff Clark_ / Tacoma P.D. / 140
                                    Chohroch      (Signature/Agency/Badge Number)

Z-2050 (2/03)

**DEF-NEIDINGER 53**